UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
KEVIN THOMPSON,

                              Plaintiff,

                                                            **MEMORANDUM OPINION**
v.                                                          **AND ORDER**

SGT. BOOTH, C.O., et al.,                                   16-CV-03477 (PMH)

                              Defendants.
---------------------------------------------------------------X
PHILIP M. HALPERN, United States District Judge:

        Plaintiff Kevin Thompson ("Plaintiff") brings this action under 42 U.S.C. § 1983 against

Sgt. Booth ("Booth"), Correction Officer ("C.O.") Salerno ("Salerno"), C.O. Garnot ("Garnot"),

C.O. Jordan ("Jordan"), C.O. Vigna ("Vigna"), Hearing Officer Woods ("Woods"), MD Hill

("Hill"), and RN Peterson ("Peterson"). (Doc. 2, "Compl."). Plaintiff alleges that while he was

incarcerated as a convicted prisoner at the Fishkill Correctional Facility ("Fishkill"), his

constitutional rights were violated.

        Judge Karas, who presided over this case before it was reassigned to me on April 16,

2020, issued an Opinion and Order on September 28, 2018 (the "Motion to Dismiss Decision"),

which dismissed certain of Plaintiff's claims. (Doc. 96, "Op. & Order"). Specifically, Judge

Karas dismissed all claims against Woods and Hill, Plaintiff's Eighth Amendment claims

alleging that he was incarcerated under unconstitutional conditions of confinement, and

Plaintiff's Fourteenth Amendment due process claims.[1] Plaintiff's claims that survived the

motion to dismiss stage and proceeded to discovery included Plaintiff's Eighth Amendment

excessive force claims against Booth, Salerno, Garnot, Jordan, and Vigna related to an alleged

January 13, 2014 assault (the "January 13 Incident") and an Eighth Amendment deliberate

---

[1] Judge Karas noted that, at the time the Motion to Dismiss Decision was issued, Peterson had been served but had not yet appeared in the action. (*Id.* at 28).

indifference to medical needs claim against Peterson related to the treatment Plaintiff received after the January 13 Incident. (*Id.* at 27).

After the Motion to Dismiss Decision was issued, on October 30, 2018, Peterson appeared *pro se* and filed an Answer. (Docs. 100, 101). Plaintiff, who had commenced this action *pro se*, secured *pro bono* counsel on February 5, 2019. (Docs. 110, 111). Booth, Garnot, Jordan, Salerno, and Vigna filed Answers on February 14, 2019. (Docs. 113-18). Although Booth was represented by the New York State Office of the Attorney General (the "AG Office") at the time he filed his Answer, on April 3, 2020, the Court granted the AG Office's motion to withdraw as counsel for Booth. (Doc. 142). Currently, both Peterson and Booth are proceeding *pro se*.

Three motions are pending presently before the Court: (1) Vigna, Salerno, Jordan, and Garnot's (the "Represented Defendants") motion for summary judgment (Doc. 156; Doc. 157 ("Defs. Br.")); (2) Peterson's *pro se* motion for summary judgment (Doc. 160); and (3) Plaintiff's motion for sanctions against Booth seeking an order striking Booth's Answer (Doc. 152; Doc. 153, "Sanctions Br.").[2] Plaintiff filed opposition to the Represented Defendants' and Peterson's motions for summary judgment in a single brief on July 15, 2020 (Doc. 162, "Pl. Opp'n"), and the summary judgment motions were fully submitted with the filing of the Represented Defendants' reply on July 29, 2020 (Doc. 166, "Reply").[3]

For the reasons set forth below the Represented Defendants' motion is DENIED, Peterson's motion is GRANTED, and Plaintiff's motion for sanctions is GRANTED.

---

[2] Plaintiff's motion seeking sanctions against Booth is unopposed. The Court details the relevant procedural and factual history regarding Booth's participation in this action *infra*.

[3] Peterson did not file a reply brief.

## BACKGROUND

The facts, as recited below, are taken from Plaintiff's Complaint, the Represented Defendants' Local Civil Rule 56.1 Statement (Doc. 155, "56.1 Stmt."), Plaintiff's Rule 56.1 Counter Statement (Doc. 164, "56.1 Counter Stmt."),[4] and the admissible evidence submitted by the parties.

I.   The January 13 Incident

Plaintiff has a history of seizures and has been diagnosed with epilepsy. (56.1 Counter Stmt. at 4 ¶ 1 (citing Doc. 165 "Lesser Decl." Ex. 3, "Thompson Dep." at 15:20-18:15, 23:8-16)). While Plaintiff was prescribed medication for his seizures, he was not taking it on January 13, 2014 because he was recovering from foot surgery performed on October 31, 2014. (Id. at 4 ¶ 2, 5 ¶ 3 (citing Thompson Dep. at 17:25-18:15)). While all parties acknowledge that there was a physical altercation between Plaintiff and Vigna, Salerno, Jordan, Garnot, and Booth just after midnight on January 13, 2014, the parties dispute at length the specifics of the incident.

According to Plaintiff, shortly after midnight, he had a seizure and blacked out. (Compl. at 3; 56.1 Counter Stmt. at 3 ¶ 10, 5 ¶ 6). After the alleged seizure, Vigna and Salerno were the first officers to arrive at Plaintiff's housing location (his "Cube"); and shortly thereafter, Jordan and Garnot arrived. (56.1 Counter Stmt. at 5 ¶¶ 8, 10). According to Plaintiff, when the officers arrived, they used broomsticks to hold down Plaintiff's legs and then began kicking and punching Plaintiff. (Id. at 5 ¶¶ 14-15 (citing Lesser Decl. Ex 1, "Thompson Decl." at 42, 44;[5] Lesser Decl. Ex. 2, "Montgomery Decl." ¶¶ 16-23)). Plaintiff apparently received a forceful

---

[4] Because Plaintiff's Rule 56.1 Statement includes his response to Defendants' statements of material facts and includes additional statements of fact, and each section begins with paragraph 1, the Court refers to the page number and paragraph number when citing to the Rule 56.1 Counter Statement.

[5] Exhibit 1 to the Lesser Decl. is a Declaration from Plaintiff as well as a number of exhibits annexed thereto in a single filing. When citing to Plaintiff's Declaration or the other documents annexed thereto, the Court cites to the Thompson Decl. and refers to the pagination generated by ECF.

blow to his face, which resulted in significant bleeding. (*Id.* ¶¶ 15-16 (citing Montgomery Decl. ¶¶ 21-22; Thompson Decl. at 46)).

According to the Represented Defendants' version of events regarding the January 13 Incident, Vigna and Salerno came to Plaintiff's cube after they heard a loud bang, and upon arriving at the Cube, Plaintiff swung a chair which struck them. (56.1 Stmt. ¶ 11 (citing Doc. 158-7, "Vigna Decl." ¶ 2; Doc. 158-8, "Salerno Decl." ¶ 3)). Plaintiff claims he has no memory of swinging a chair and a fellow inmate who witnessed the dispute stated that he did not see Plaintiff swing a chair. (56.1 Counter Stmt. ¶ 11 (citing Thompson Decl. at 3 ¶ 12; Montgomery Decl. ¶ 25)). Vigna and Salerno stated the only force used against Plaintiff was a body hold to bring him to the ground and that the force used to subdue Plaintiff was appropriate. (56.1 Stmt. ¶ 12 (Vigna Decl. ¶¶ 5, 10; Salerno Decl. ¶¶ 9, 13)). At some point Booth arrived on the scene, Jordan and Booth handcuffed Plaintiff, and a spit mask was placed over Plaintiff's face. (*Id.* ¶¶ 14-15; 56.1 Counter Stmt. at 6 ¶¶ 18-19 (citing Thompson Decl. at 2 ¶ 11)).

Following the June 13 Incident, Plaintiff was taken to the Fishkill Medical Unit, administered Ativan, and eventually transferred to two outside hospitals for treatment—first St. Luke's Hospital ("St. Luke's") and then Mount Vernon Hospital ("Mount Vernon"). (56.1 Stmt. ¶ 16; 56.1 Counter Stmt. at 6 ¶ 24). In the Fishkill Medical Unit, Plaintiff was examined by Peterson who noted that "[d]ried blood was visualized to the facial area and oral cavity through the mask. Copious amounts of [] blood noted on the floor." (56.1 Counter Stmt. at 4 ¶ 17 (citing Lesser Decl. Ex. 4, "Peterson Dep." at 136:20-22)). The medical records from Mount Vernon indicate that the results of an EEG showed no evidence that Plaintiff suffered a seizure on

January 13, 2014. (56.1 Stmt. ¶ 18 (citing Ex. O Mount Vernon Hospital Record,[6] "Medical Records" at 45)). The Medical Records do indicate, however, that Plaintiff reported a "history of epilepsy, and says that he has seizures around every 2 weeks" and that on the night of January 13, 2014 Plaintiff "likely" suffered a "psychogenic pseudoseizure." (56.1 Stmt. ¶ 19 (citing Medical Records at 53)).

Upon his return to Fishkill, Plaintiff was kept in isolation at the Fishkill infirmary and then later transferred to the Special Housing Unit (the "SHU") where he was held in solitary confinement under constant supervision. (56.1 Counter Stmt. at 6 ¶¶ 25, 28).

## II. Exhaustion of Administrative Remedies

Plaintiff alleges that while he was still housed at Fishkill he filed a grievance related to the January 13 Incident, but that the grievance was "never processed." (Compl. at 4). Plaintiff argued, in his opposition to Defendants' motion to dismiss that "[u]pon returning from Mount Vernon Hospital[,] Plaintiff was immediately placed in solitary confinement for six months. . . . Plaintiff filed grievances." (Doc. 8 ¶ 27; *see also id*. ¶ 28 ("Plaintiff's repeated grievances and complaints were ignored.")).[7] At his deposition, Plaintiff testified that he filed a grievance at Fishkill related to the January 13 Incident "a day or two days after" he returned from Mount

---

[6] The Represented Defendants' Rule 56.1 Statement and Opening Brief refer to Exhibit O, however no Exhibit O appears on the docket. (*See generally* Docs. 158, 159). Courtesy copies of the Represented Defendants' moving papers and exhibits filed in support of their motion were sent to the Court's Chambers, including Exhibit O. The Court assumes that the Represented Defendants intended to file Exhibit O under seal as it contains potentially sensitive medical information related to Plaintiff but notes that the Represented Defendants did not comply with this Court's Individual Practices regarding the process for filing exhibits under seal and never requested permission to file Exhibit O under seal. Nonetheless, the Court considers the portions of Exhibit O referenced in the parties' 56.1 statements on the present motion.

[7] Judge Karas, in the Motion to Dismiss Decision, relied on Plaintiff's Complaint and the facts alleged in Plaintiff's opposition to the motion to dismiss that were consistent with the Complaint. (Op. & Order at 10 ("As noted, the Court may consider factual allegations raised for the first time in a *pro se* plaintiff's opposition papers if they are plausible and consistent with the allegations in the complaint. *See Vlad-Berindan v. MTA New York City Transit*, No. 14-CV-675, 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014).")) The Court adopts the same approach here.

Vernon. (Lesser Decl. Ex. 3, "Thompson Dep." at 87:24-88:12; *see also id.* at 103:3-6 (testifying that he filed a grievance "as soon as [he] got back to [Fishkill] in January of 2014")).

Plaintiff's Declaration provides more detail regarding his apparent attempts to file grievances. First, on January 18, 2014, after returning from Mount Vernon, Plaintiff wrote a letter to the Superintendent of Fishkill related to the January 13 Incident. (Thompson Decl. at 5 ¶ 23; *see also id.* at 12). On or about that same day, while Plaintiff was being held in isolation at the Fishkill infirmary, he filed a formal grievance. (*Id.* at 6 ¶ 24). Because Plaintiff was being held in isolation, he was unable to submit the grievance form to the inmate grievance box and instead handed his grievance form to a correction officer for filing. (*Id.* at 6 ¶ 25). No copy of this grievance form appears in the record. On January 20, 2014, Plaintiff was moved from the infirmary to the SHU. (*Id.* at 6 ¶ 26). At this time, Plaintiff attempted to file a second grievance. (*Id.* at 6-7 ¶ 28). Because Plaintiff was in solitary confinement in the SHU, Plaintiff "was dependent on the correctional officers who made their rounds or gave [Plaintiff] breakfast to take [the] grievance form and submit it for [him] by placing it in the box." (*Id.* at 7 ¶ 29). Plaintiff retained a copy of this grievance form. (*Id.* at 14). On January 25, 2015, Plaintiff wrote a third grievance and attempted to file it the same way he had attempted to file the second grievance, by placing the form through the slot of his cell and giving it to a correction officer for filing. (*Id.* at 8 ¶ 34). Plaintiff retained a copy of this grievance form as well. (*Id.* at 16). Plaintiff never received a response to any of these grievances. (*Id.* at 8 ¶ 35).

Defendants, for their part, state that Plaintiff did not file any grievances related to the January 13 Incident while at Fishkill. (56.1 Stmt. ¶ 1).

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, No. 17-CV-3875, 2020 WL 917294, at *4 (S.D.N.Y. Feb. 26, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence. The task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come

forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to raise an issue of material fact with respect to an essential element of her[] claim, the District Court properly granted summary judgment dismissing that claim"). Simply put, the movant must establish separately that the law favors the judgment sought.

## ANALYSIS

Plaintiff's surviving claims include: (1) Eighth Amendment claims against Vigna, Salerno, Jordan, Garnot, and Booth related to the alleged excessive force inflicted upon Plaintiff during the course of the January 13 Incident; and (2) an Eighth Amendment claim against Peterson related to her deliberate indifference to Plaintiff's medical needs following the January 13 Incident. Defendants argue that summary judgment should be entered in their favor because there are no genuine issues of material fact. The Court analyzes Defendants' arguments *seriatim*.

I.     <u>Claims Against the Represented Defendants</u>

      a.     <u>Eighth Amendment Excessive Force Claim</u>

"The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment . . . prohibits the infliction of 'cruel and unusual punishments,' . . . including the 'unnecessary and wanton infliction of pain.'" *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (internal citations omitted)). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)). Regarding the subjective component, the defendant must have "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Id.* (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). "When prison officials are accused of using excessive force, the 'wantonness' issue turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). "To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Castro v. City of New York*, No. 16-CV-8147, 2020 WL 6782000, at *10 (S.D.N.Y. Nov. 18, 2020) (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)). "[D]etermining

whether officers used *excessive* force necessarily turns on the need for the force used." *Harris v. Miller*, 818 F.3d 49, 64 (2d Cir. 2016) (emphasis in original).

As to the objective component, the inmate must prove "that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Id.* (quoting *Crawford v. Cuomo*, 796 F.3d 252, 265 (2d Cir. 2015)). This inquiry is "context specific, turning upon 'contemporary standards of decency.'" *Id.* (quoting *Blyden*, 186 F.3d at 263). "[W]hen prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated.'" *Wright*, 554 F.3d at 269-70 (quoting *Hudson*, 503 U.S. at 9). Thus, "the malicious use of force to cause harm" constitutes a "'*per se*' violation of the Eighth Amendment." *Castro*, 2020 WL 6782000, at *10 (quoting *Harris*, 818 F.3d at 64). The court's focus, at the objective component stage, is not on the severity of the injuries suffered and even "minor" injuries can support an Eighth Amendment claim, *Sims*, 230 F.3d at 21, "as long as the amount of force used is not *de minimis*," *Harris*, 818 F.3d at 64 (quoting *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999)).

"[W]hether a 'use of force was' justified is a 'fact intensive inquiry' that often must be 'left for a jury to decide.'" *Castro*, 2020 WL 6782000, at *10 (quoting *Ismael v. Charles*, No. 18-CV-3597, 2020 WL 4003291, at *7 (S.D.N.Y. July 15, 2020)). Thus, "granting summary judgment against plaintiffs on excessive force claims is rarely appropriate." *Ismael*, 2020 WL 4003291, at *7 (quoting *Anderson v. City of New York*, No. 16-CV-02583, 2019 WL 1426723, at *8 (S.D.N.Y. Mar. 28, 2019)). "The Second Circuit has [] 'reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak.'" *Wright*, 554 F.3d at 269 (collecting cases).

Here, the Represented Defendants argue that summary judgment is appropriate because the evidence establishes that the correction officers used "the least amount of force needed to restrain an out of control inmate and transport him to the medical center for evaluation and treatment." (Defs. Br. at 15). Given the aforementioned standards applicable to an Eighth Amendment excessive force claim, and the inherent fact-intensive nature of the inquiry, the Court finds that there are genuine issues of material fact precluding the entry of summary judgment.

At bottom, the parties dispute at length how the January 13 Incident began. According to Vigna, he "heard a loud banging noise" coming from Plaintiff's cube, and after going to investigate the situation, Plaintiff "was down on the floor in a crouched position but soon came upward with his metal chair and started swinging the chair and screaming 'motherfuckers' in [Vagna's] direction." (Vigna Decl. ¶ 4). Vigna claims that Plaintiff "struck [him] with the chair on [his] lower knees" at which time Vigna called for assistance. (*Id*.). Salerno's description of Plaintiff's conduct is consistent with that offered by Vigna. (Salerno Decl. ¶ 3 (Plaintiff "swung a metal chair wildly and repeatedly in [Salerno's] direction and in the direction of C.O. Vigna before he successfully struck [Salerno] with the metal chair on the knees.")). Both Vigna and Salerno claim that in response to Plaintiff swinging a chair at them they used "appropriate and legitimate force to put an end to a dangerous situation caused by" Plaintiff. (Vigna Decl. ¶ 2; Salerno Decl. ¶ 4). Specifically, Vigna and Salerno claim that they held Plaintiff's upper torso and grabbed his legs to bring him to the ground. (56.1 Stmt. ¶ 12 (citing Vigna Decl. ¶ 5; Salerno Decl. ¶ 9)). Jordan, Garnot, and Booth then responded to the scene and placed Plaintiff in handcuffs and put a spit mask over Plaintiff's head. (*Id*. ¶¶ 13-15).

Plaintiff's version of events differs in substantial and significant ways. Plaintiff claims that on January 13, 2014 he had a seizure, blacked out, and has no memory of swinging a chair at Vigna and Salerno. (56.1 Counter Stmt. at 3 ¶¶ 10-11). Plaintiff claims that when officers came to his Cube, they used broomsticks to hold his legs down, and kicked and punched him before placing him in handcuffs that were too tight and putting a spit mask over his head. (*Id*. at 5-6 ¶¶ 14-15, 18-19). Plaintiff's version of events is corroborated by other inmates who allegedly witnessed the January 13 Incident. Montgomery, one of those inmates, completed a Declaration that largely corroborates Plaintiff's version of events. (*See* Montgomery Decl. ¶ 11 (Montgomery "looked into [Plaintiff's] cube area and [he] saw [Plaintiff] lying on the ground and he was shaking a lot. He appeared to be in a completely incoherent state of mind"); *id*. ¶¶ 11-15 (Montgomery believed Plaintiff was having a seizure); *id*. at ¶¶ 18-19 (the correction officers "were being very aggressive with [Plaintiff]" and "pulled [Plaintiff's] legs and dragged him out of his cube"); *id*. ¶ 21 ("[O]ne of the CO's forcefully slammed [Plaintiff] down to the ground"); *id*. at ¶ 23 ("One of the COs kicked [Plaintiff's] body while he was on the floor, trying to control him while he was convulsing"); *id*. ¶ 25 ("[A]t no point did I see [Plaintiff] hit or fight the COs. At no point did I see [Plaintiff] swing a chair"); *id*. ¶ 26 ("[T]he COs brought over brooms to try and keep [Plaintiff] from flailing and convulsing. They tried to use the brooms to hold him down."); *id*. ¶ 29 ("[T]he COs kicked him and punched him to keep him down")). Additionally, a hearing was conducted at Fishkill on February 5, 2014 in which other inmates testified about the January 13 Incident. (*See* Thompson Decl. at 18-58). The testimony of these other inmates, Briggs and Lee, is also consistent with Plaintiff's version of events. (*Id*. at 42 (inmate Briggs testified that Plaintiff "was having a seizure," a corrections officer "put a broom on [Plaintiff's] leg as the other officers that were on the side pulled him back out in the hallway," and Briggs did

not see plaintiff swing a chair); *id*. at 47-49 (inmate Lee testified that Plaintiff was convulsing, "the officers picked up a broom . . . and put it on his legs," and that Lee did not see Plaintiff swing a chair at correction officers)).

The factual disputes regarding the January 13 Incident preclude the entry of a summary judgment order. There are clearly genuine disputes of material facts. Certainly, the appropriate response by correction officers to a situation involving an inmate attacking those correction officers by swinging a chair and the appropriate response to an inmate suffering a seizure are radically different.[8] Given the genuine factual disputes, it is a task for the fact-finder, not the Court, to determine whether the proof adduced at trial is sufficient to establish the subjective and objective components of an Eighth Amendment excessive force claim. *See, e.g.*, *Ismael*, 2020 WL 4003291, at *7 (S.D.N.Y. July 15, 2020) (finding that it "is unsurprising [that summary judgment on an excessive force claim is rarely appropriate] because whether a 'use of force was' justified is a 'fact intensive inquiry' that often must be 'left for a jury to decide.'" (quoting *Olutosin v. Lee*, No. 14-cv-685, 2016 WL 2899275, at *9 (S.D.N.Y. May 16, 2016))).

   b.   PLRA Exhaustion

The Represented Defendants argue also that summary judgment is appropriate because Plaintiff failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"). (Defs. Br. at 6-15). While Plaintiff concedes that he did not exhaust his administrative remedies because he never appealed the denial of a grievance, he argues that his failure to exhaust should be excused because there are genuine factual disputes regarding whether the administrative remedies were available to him. (Pl. Opp'n at 9-15).

---

[8] While the Represented Defendants maintain that the Medical Records indicate that Plaintiff did not have a seizure, but rather had a psychogenic pseudoseizure (56.1 Stmt. ¶¶ 18-19), this distinction is of no moment on the present motion. The Represented Defendants have not in any way endeavored to explain to the Court how this distinction is meaningful and have not included any expert testimony to shed light on same.

The PLRA requires an inmate who seeks to bring claims under § 1983 in federal court to "exhaust the administrative remedies that are available at that prison before proceeding in federal court." *Ortiz v. Annucci*, No. 17-CV-3620, 2019 WL 1438006, at *8 (S.D.N.Y. Mar. 29, 2019) (citing 42 U.S.C. § 1997e(a)). The exhaustion requirement is "mandatory." *Id.* (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016)). "[T]he Supreme Court and Second Circuit have instructed, 'proper exhaustion . . . means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id.* (quoting *Hernandez v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (emphasis in original)). "The exhaustion inquiry thus requires that [the court] look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Id.* (quoting *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009)).

An inmate's failure to exhaust administrative remedies may only be excused if the remedies are unavailable. *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016). An administrative remedy is considered unavailable in three situations: (1) when the remedy "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when the "administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use;" or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 123-24 (quoting *Ross*, 136 S. Ct. at 1859-60). "Defendants bear the burden of proving that Plaintiff failed to exhaust available administrative remedies." *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *7 (S.D.N.Y. Sept. 28, 2018) (citing *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015)).

Here, Plaintiff relies on the second unavailability exception and argues that the Court should deem the grievance procedure unavailable to him because he provided multiple grievance complaints to prison officials for filing, but the complaints were never filed. The process by which an inmate can properly exhaust his remedies in such a situation is so opaque, Plaintiff argues, that the administrative scheme is incapable of use and thus unavailable. Plaintiff relies, principally, on *Williams* in support of his argument. *See generally* 829 F.3d. There, the Second Circuit recognized that while an inmate housed in the general population can file a grievance with the grievance clerk, an inmate who is housed in the SHU, "and therefore [is] segregated from the regular prison population . . . may give the grievance complaint to a correction officer to file for him." *Id*. at 119 (citing N.Y. Comp. Codes R. & Regs. ("NYCRR") Tit. 7, §§ 701.7, 705(a)(1), 705(a)(2)). The inmate in *Williams* alleged that "while he was housed in the SHU . . . he drafted a grievance . . . [and] gave the grievance to a correction officer to forward to the grievance office of his behalf." *Id*. at 120-21. The inmate "never received a response to the grievance and allege[d] that the correction officer in the SHU never filed it for him." *Id*. at 121. It was undisputed that Williams never appealed the grievance. *Id*. Defendants moved to dismiss Williams's complaint arguing that Williams had failed to exhaust his administrative remedies as is required by the PLRA. *Id*. Taking Williams's allegations as true (the court was adjudicating a motion to dismiss), the Second Circuit held that the "regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Id*. at 124. The court found that "the regulations give no guidance whatsoever to an inmate whose grievance was never filed[,] . . . do not describe a mechanism for appealing a grievance that was never filed[,] . . . [and thus,] the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no

inmate could actually make use of it." *Id*. at 124, 126. The court concluded that the grievance procedures were unavailable to Williams because they were "so opaque and confusing that they were 'practically speaking, incapable of use.'" *Id*. (citing *Ross*, 136 S. Ct. at 1859).

Since *Williams*, other courts within the Second Circuit have applied that court's rationale to find that summary judgment is not proper when the evidence presented on a summary judgment motion is consistent with the inmate's allegations in *Williams*. *See Ortiz*, 2019 WL 1438006, at *1 (denying defendants' motion for summary judgment and finding that plaintiff had sufficiently demonstrated that a genuine dispute of material facts existed with respect to whether he successfully exhausted his administrative remedies where the plaintiff "maintain[ed] that he drafted and attempted to file a grievance detailing the [assault] well within the twenty-one day period for initiating a claim – but that the officer to whom he handed the grievance failed to file it."); *see also Hamlett v. Stotler*, No. 17-CV-0939, 2019 WL 4306999, at *9 (N.D.N.Y. Aug. 15, 2019), *adopted by* 2019 WL 4305443 (N.D.N.Y. Sept. 11, 2019); *Terry*, 2018 WL 4682784, at *9; *Jackson v. Downstate Corr. Facility*, No. 16-CV-0267, 2018 WL 3650136, at *8 (S.D.N.Y. July 31, 2018).

Here, the essential factual allegations bearing on whether Plaintiff may be excused from exhausting his administrative remedies, which are supported by documentary evidence and deposition testimony, are, at bottom, indistinguishable from *Williams*. Those essential allegations include that Plaintiff (1) was placed in isolation in the infirmary or solitary confinement in the SHU and therefore had to rely on correction officers to file his grievances, (2) timely gave his grievance to prison officials to file, (3) believed the prison officials had filed a grievance on his behalf, and (4) failed to appeal the grievance.

Plaintiff has claimed, on multiple occasions, that he attempted to file a grievance at Fishkill by handing a grievance complaint form to prison officials. In his Complaint he alleged that he filed a grievance related to the January 13 Incident, but the grievance was "never processed." (Compl. at 4). In his opposition to Defendants' motion to dismiss, Plaintiff argued that he filed grievances related to the January 13 Incident. (Doc. 8 ¶¶ 27-28). At his deposition, Plaintiff testified that he filed a grievance at Fishkill related to the January 13 Incident "a day or two days after" he returned from Mount Vernon. (Thompson Dep. at 87:24-88:12; *see also id*. at 103:3-6 (testifying that he filed a grievance "as soon as [he] got back to [Fishkill] in January of 2014.")). Plaintiff's Declaration provides additional detail regarding his attempts to file grievances. (*See generally* Thompson Decl.). Overall, Plaintiff claims that he attempted to file three separate grievances at Fishkill related to the January 13 Incident between January 18, 2014 and January 25, 2014. (*Id*. at 6 ¶ 24; *id*. at 6-7 ¶ 28; *id*. at 8 ¶ 34). Additionally, Plaintiff annexed to his Declaration what he represents to be copies of the latter two grievances. (*Id*. at 14, 16). These grievances, had they been filed, were timely, *see* 7 NYCRR § 701.5(a)(1) (inmate must file grievance within twenty-one days), and related to the January 13 Incident (*see* Thompson Decl. at 14 (grievance dated January 20, 2014 provides, "On 1-13-14 at Fishkill . . . I was assaulted . . . ."); *id*. at 16 (grievance dated January 25, 2014 provides "On 1/13/14 at Fishkill . . . I was physically abuse[d] . . . .")). Plaintiff claims he never got any response to these grievances, that they were never filed, and that he should thus be excused for his failure to appeal the grievances. Given the evidence in the record, Plaintiff maintains, that at the very least, and consistent with *Williams* and its progeny, there is an issue of fact as to whether administrative remedies were available to Plaintiff.[9]

---

[9] Any grievance complaints filed by Plaintiff at Great Meadow Correctional Facility are irrelevant as Plaintiff was not transferred to Great Meadow until on or about March 3, 2014, which is well-beyond the

The Represented Defendants argue in reply that Plaintiff is improperly attempting to create an issue of fact regarding his unavailability defense that is not supported by the record. (Reply at 5-10). While the Represented Defendants are correct that Plaintiff's testimony and subsequent grievance forms filed at Great Meadow are not completely consistent regarding Plaintiff's apparent history of filing grievances related to the January 13 Incident at Fishkill, this Court, at the summary judgment stage, will not weigh in on the factual dispute or make credibility determinations regarding Plaintiff's sometimes conflicting testimony. Such factual disputes and credibility determinations are to be resolved by the fact-finder, not this Court on a summary judgment motion. The Court finds, "drawing all inferences in Plaintiff's favor, there is a dispute of material fact regarding whether Plaintiff's grievance went unfiled," *Terry*, 2018 WL 4682784, at *10, and because Plaintiff "need not exhaust remedies if they are not 'available,'" *Ross*, 136 S. Ct. at 1855, Defendants' motion for summary judgment based upon lack of exhaustion is denied.

## II.   Peterson's Motion for Summary Judgment

Peterson, who is proceeding *pro se*, separately moves for summary judgment.[10] The only allegation levied against Peterson in the Complaint is that after the January 13 Incident, "Peterson failed to take pictures [] for medical purposes." (Compl. at 3). Plaintiff makes no further mention of Peterson in his Complaint. To the extent Judge Karas, in the Motion to Dismiss Decision, considered additional factual allegations alleged in Plaintiff's opposition to

---

twenty-one-day period in which an inmate must file a grievance.

[10] The form of Peterson's motion is not in compliance with the Local Civil Rules. Peterson did not, for example, file a notice of motion or a 56.1 statement with citations to admissible evidence. While a *pro se* litigant is not excused from complying with the court's Local Civil Rules, the court, in its discretion, may excuse a *pro se* litigant's failure to comply. *See Wilton Reassurance Life Co. of New York v. Smith*, No. 12-CV-5131, 2015 WL 631973, at *10 (E.D.N.Y. Feb. 13, 2015) ("The Court will also excuse Defendants' failure to comply with Local Rule 56.1." (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001))). The Court exercises that discretion here.

Defendants' motions to dismiss as part of the operative pleading (*see* Op. & Order at 2), Plaintiff further alleges that after the January 13 Incident "Peterson injected Plaintiff with some substance, after which Plaintiff began feeling relaxed and tired" and that "after being seen by Defendant Peterson, plaintiff was transported to St. Luke's Hospital." (Doc. 80 at 6).[11]

Peterson's motion and Plaintiff's opposition brief interpret Plaintiff's allegations as an Eighth Amendment claim for relief under § 1983 related to deliberate indifference to Plaintiff's medical needs. (*See* Peterson Br. at 3 (the Complaint "maintains that Defendant Peterson violated [Plaintiff's] Eighth Amendment rights by failing to render proper medical attention.; Pl. Opp'n at 23 ("Plaintiff has established genuine issues of material fact as to whether Defendant Peterson acted with deliberate indifference to plaintiff's serious medical needs.")). Because Plaintiff was proceeding *pro se* at the time he filed his Complaint and opposition to Defendants' motions to dismiss, the Court applies the required liberality to a *pro se* Plaintiff's pleading and interprets the Complaint as asserting an Eighth Amendment deliberate indifference claim against Peterson.

An inmate can establish an Eighth Amendment claim related to inadequate medical care by establishing that a prison official was "deliberate[ly] indifferen[t] to [his] serious medical needs." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle v. Gamble*, 429

---

[11] The Court will not consider additional factual allegations made by Plaintiff for the first time in Plaintiff's opposition brief to Peterson's motion for summary judgment. While it is appropriate to consider allegations in a *pro se* plaintiff's opposition to a motion to dismiss that are consistent with his pleading, *see Vail v. City of New York*, 68 F. Supp. 3d 412, 427 (S.D.N.Y. 2014) ("Where new allegations in a *pro se* plaintiff's opposition memoranda 'are consistent with the allegations contained' in the Complaint, they may be read 'as supplements to th[e] pleadings'" (quoting *Boyer v. Channel 13, Inc.*, No. 04-CV-2137, 2005 WL 2249782, at *6 (S.D.N.Y. Mar. 9, 2005))), Plaintiff secured counsel after the Motion to Dismiss Decision was issued. Plaintiff did not file an Amended Complaint and thus the Court will not, at this late stage, permit Plaintiff to amend his pleading through new allegations raised in his opposition to Peterson's motion for summary judgment. For example, Plaintiff's allegation that Peterson "had time to review Plaintiff's medical records" but "did not review his medical records in enough detail to know that he had a history of seizures" (Pl. Opp'n at 24-25) is not considered.

U.S. 97, 104 (1976)). The deliberate indifference standard includes an objective and subjective component which requires the inmate to prove that the alleged deprivation was objectively "sufficiently serious" and that the defendant subjectively acted "with a sufficiently culpable state of mind." *Id*. (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)).

Peterson argues that the medical care she provided to Plaintiff on the night of January 13 was appropriate and that there is no genuine dispute of material fact regarding the subjective component of an Eighth Amendment deliberate indifference claim. The Court agrees.

Plaintiff's sparse allegations in no way establish that Peterson "knew of and disregarded the plaintiff's serious medical needs." *See Chance*, 143 F.3d at 703. In fact, the opposite is true. After Plaintiff was transported to the Fishkill Medical Unit after the January 13 Incident, Peterson gave Plaintiff medication that made Plaintiff feel "relaxed and tired" at which time Plaintiff was transported to St Luke's Hospital for additional treatment. (Doc. 80 at 6). Based on these allegations, no reasonable jury could find that Peterson acted with a sufficiently culpable state of mind.

Accordingly, the Eighth Amendment deliberate indifference claim against Peterson is dismissed.

III.   Plaintiff's Motion for Sanctions

Plaintiff moves to strike Booth's Answer pursuant to Federal Rule of Civil Procedure 37. Plaintiff's motion is unopposed.[12] Plaintiff argues that Booth failed to appear for his deposition and has otherwise failed to participate in this action. (Sanctions Br. at 1). A brief recitation of the relevant procedural history regarding Booth is necessary to adjudicate Plaintiff's motion.

---

[12] A Certificate of Service was annexed to Plaintiff's Notice of Motion indicating that Plaintiff had served his motion on Booth at his home address. (Doc. 152 at 2).

On April 5, 2017, Booth was served with a summons and complaint (Doc. 53) and on April 12, 2017, the AG's Office entered a Notice of Appearance on Booth's behalf (Doc. 48). On October 8, 2019, Plaintiff served a Notice of Deposition on Booth through his then-counsel, the AG's Office. (*Id*. at 2). After Plaintiff was informed that Booth was unavailable for deposition prior to the January 31, 2020 discovery cut-off date, Plaintiff filed a pre-motion conference letter in anticipation of moving to compel Booth's deposition. (Doc. 130). On January 23, 2020, the AG's Office filed a motion to withdraw as counsel for Booth. (Doc. 132). On January 25, 2020, Judge Karas referred this matter to Chief Magistrate Judge Davison for all general pretrial matters. (Doc. 134). Judge Davison held a pre-motion conference on February 6, 2020 to address Plaintiff's anticipated motion to compel Booth's deposition. (Doc. 137). Following the conference, Judge Davison granted Plaintiff permission to move to compel. (Feb. 6, 2020 Min. Entry). On February 12, 2020, Plaintiff filed his motion to compel (Doc. 138), and on February 13, 2020, the motion to compel was granted, which directed Booth to appear for his deposition by March 3, 2020 (Doc. 140). Booth did not appear for his scheduled March 3, 2020 deposition. (Sanctions Br. at 3). The AG's Office notified Plaintiff that it had attempted to serve Booth with his deposition notice and to notify Booth of his deposition date. (*Id*.). On April 3, 2020, the Court granted the AG's Office's motion to withdraw as counsel for Booth. (Doc. 142). To date, no substitute counsel has appeared on Booth's behalf and Booth has not entered a *pro se* notice of appearance. In fact, since the AG's Office's motion to withdraw as counsel was granted, Booth has not communicated with the Court in any way.

According to Plaintiff, he has tried to serve court papers on Booth on various occasions, but the mail has consistently been returned as undeliverable. (Sanctions. Br. at 3). Plaintiff's counsel did, however, speak with Booth by phone on May 5, 2020. (*Id*.). On that day, Plaintiff's

counsel called Booth to notify Booth that a conference was scheduled in this matter for May 11, 2020. (*Id.*). Booth answered the phone, but after counsel identified himself, Booth hung up. (*Id.* at 4). Booth did not appear at the May 11, 2020 conference and the Court granted Plaintiff's request to move for sanctions pursuant to Rule 37, including moving for an order striking Booth's Answer. (May 11, 2020 Min. Entry).

Rule 37 provides that "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders" including "striking pleadings in whole or in part." Fed. R. Civ. P. 37(b)(2)(A)(iii). Rule 37 further provides "[t]he court where the action is pending may, on motion, order sanctions if . . . a party . . . fails, after being served with proper notice, to appear for that person's deposition." Fed. R. Civ. P. 37(d)(1)(A)(i). While striking a litigant's pleading is a "drastic" remedy, it is appropriate to impose such a remedy where the party's disobedience with a court order "has been willful, or in bad faith, or otherwise culpable." *Beattie v. Bolla Taxi, Inc.*, No. 01-CV-1270, 2003 WL 22070538, at *2 (S.D.N.Y. Sept. 5, 2003) (quoting *Luft v. Crown Publishers, Inc.*, 906 F.2d 862, 865 (2d Cir. 1990)). "[T]he decision to impose such sanctions is committed to the sound discretion of the district court and may not be reversed absent an abuse of that discretion." *Luft*, 906 F.2d at 865.

The Court finds that Booth's failure to obey the court order directing him to appear at a March 3, 2020 deposition coupled with his refusal to speak to counsel on May 5, 2020, appear for the May 11, 2020 court conference, file opposition to Plaintiff's motion for sanctions, or communicate with the Court in any way since the AG Office's motion to withdraw as counsel was granted on April 3, 2020, demonstrate the type of willful and bad faith conduct that justifies the striking of Booth's Answer. *See, e.g.*, *Lopez v. J & K Floral USA, Inc.*, 307 F. Supp. 3d 257,

260 (S.D.N.Y. 2018) ("Given Defendants' past and repeated disregard of discovery requests and this Court's orders, . . . [s]triking the Answer is warranted.").

Accordingly, Plaintiff's motion for sanctions is granted and Booth's Answer (Doc. 113) is stricken.

## <u>CONCLUSION</u>

The Represented Defendants' motion for summary judgment is DENIED, Peterson's motion for summary judgment is GRANTED, and Plaintiff's motion for sanctions is GRANTED.

The Clerk is directed to terminate Defendant Charlotte Peterson from the docket, to strike Defendant Sgt. Booth's Answer from the docket (Doc. 113), and to terminate the pending motions (Docs. 152, 156).

The Clerk is directed further to mail a copy of this Memorandum Opinion and Order to Defendant Peterson at the address on the docket and to Defendant Booth at 11 Tillson Avenue, Apartment 2, Highland, NY 12528.

The Court shall hold a Case Management Conference on April 7, 2021 at 12:00 p.m. At the time of the scheduled conference all parties shall call (888) 398-2342; access code: 3456831.

Dated: White Plains, NY
      March 10, 2021

**SO ORDERED.**

_____
Philip M. Halpern
United States District Judge